Filed 7/15/13  In re Z.P. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Z.P., a Person Coming Under the Juvenile Court Law. | B245935 (Los Angeles County Super. Ct. No. CK95157) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.P., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Sherri Sobel, Referee.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

R.P. (father), the father of minors Z.P. and K.P. (collectively the children), appeals from the juvenile court's jurisdiction and disposition orders.[1] According to father, because the jurisdiction order was based on a single incident between him and mother and no such similar incidents had occurred during the six month period prior to the jurisdictional findings, there was insufficient evidence to support that order. Father also contends that because he was not living with mother at the time of the incident and had no relationship with her at the time the disposition order was entered, there was no factual basis upon which the juvenile court could order the removal of the children from him.

The Department of Children and Family Services (DCFS) cross-appeals from the juvenile court's order dismissing the allegations in paragraph a-1 of the dependency petition. DCFS contends that because the allegations in paragraph a-1 were identical to the allegations of another paragraph that the juvenile court found true, the court erred in dismissing the allegations of paragraph a-1.

We hold that substantial evidence supported the jurisdiction and disposition orders and that, because we affirm the juvenile court's jurisdiction, we do not need to reach the jurisdictional issue raised by the cross-appeal. We therefore affirm the jurisdiction and disposition orders from which father appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

In a detention report, a children's social worker (CSW) reported that Z.P. and her family came to the attention of DCFS as the result of a domestic violence incident involving mother and father. Mother and father engaged in an argument that escalated into a physical altercation. Father scratched mother, causing bruising to her forearm.

---

[1] As discussed below, the children's mother, S.G. (mother), did not appeal from the jurisdiction and disposition orders.

Father was arrested by the Whittier Police Department and mother filed for a temporary restraining order. Father was released from jail later that evening.

As part of DCFS's investigation into the incident, a CSW interviewed mother who stated that the allegations concerning the incident were "partially" true. Mother explained that because she had no income, she filed for welfare assistance which required that she "put . . . father's information down." When a social worker from the welfare office contacted father to verify that the children were his, father became "extremely angry" because he had three older children and "would not be able to afford to pay back what [the welfare agency] would be giving [mother] for assistance." Father came to mother's residence and asked her to discontinue her welfare benefits. Mother refused, saying she needed the assistance. Although mother and father engaged in an argument over the issue, she denied that any physical altercation occurred. Mother admitted that father grabbed her and bruised her arm, but added that father's actions were not violent. Mother did not understand why father had been arrested and did not want to press charges, but the police were forcing her to press charges.

According to mother, father was not living with her and the children, and she only communicated with father by telephone. The children, however, were present during her argument with father.

The CSW observed and assessed Z.P. and K.P., and they appeared to be in good health and did not show any signs of abuse or neglect. Due to the ages of the children, the CSW was unable to obtain any statement from them regarding the alleged incident.

The CSW obtained and summarized a copy of the Whittier Police Department's report on the incident, including mother's statements to the police that father had a history of methamphetamine use; had arrived home the night before his arrest under the influence of methamphetamine with a glass pipe in his pocket; and had physically assaulted her causing injury to her arm.

Upon reviewing the police report, the CSW attempted to locate the family, but discovered that mother had moved out of her apartment and into her father's home without notifying DCFS. The CSW eventually contacted mother and asked her to come

to the CSW's office to discuss additional concerns the CSW had based on the information contained in the police report. Mother came to the office with the children and her father, the children's maternal grandfather. Mother stated that she had been honest with the CSW during her initial interview, and denied making the statements in the police report that she found a glass pipe in father's pocket and observed father acting strangely as if under the influence of methamphetamine. Mother did admit that father had a history of abusing methamphetamine, but she was not aware if he was currently using it. Mother claimed she did not hit father as the police had reported. When CSW informed mother that the CSW needed to interview father again, mother stated that although she had maintained telephone contact with father, he did not have any contact with the children and she would not allow contact unless and until he contacted DCFS.

The CSW then interviewed the maternal grandfather who was "blown away" by the allegations of domestic abuse. When he asked mother about the allegations, she told him that she did not have any concerns about father's drug use and denied that she and father had any altercations. The maternal grandfather informed the CSW that his grandchildren were not at risk of harm by father because they had moved in with him, along with mother.

About two weeks later, father came to the CSW's office unannounced and asked to speak to the CSW about the allegations of domestic abuse. Father was angry with the CSW and told her he did not understand "what was going on." The CSW explained the allegations to father and told him she had reviewed the police report on the incident. Based on the report, the CSW told father that she had concerns about his substance abuse issues. When she asked father if he would be willing to submit to on-demand drug testing, he refused to agree to participate in such testing and told the CSW that he was not under the influence of drugs and that testing would be a waste of time. Father also declined to answer questions about his substance abuse history. He complained that he did not understand why the DCFS investigation was still ongoing when the police had released him and did not charge him due to a lack of evidence. He continued to voice

4

concerns about how DCFS was treating him based on his past.[2]  Father wanted the DCFS investigation closed.  The CSW explained that DCFS had concerns about his children's safety and well-being because he and mother appeared to be "minimizing" the incident. Specifically, the CSW informed father that DCFS was concerned that mother had found a methamphetamine pipe in his pocket, that he had an "extensive criminal history regarding charges of possession of illegal substances . . . ," and that the children were present during his physical and verbal altercation with mother.  Father agreed that mother would have full custody of the children and understood that DCFS would attempt to obtain an order to that effect through the juvenile court.  He also agreed that the children would be released to mother and detained from him.

The detention report attached a police report of the domestic abuse incident which brought the family to the attention of DCFS and that contained the following information. On June 2, 2012, at approximately 2:51 p.m., Whittier police officers responded to a call regarding an argument between a man and a woman.  When they arrived at the location, they heard a man and woman arguing in the middle of the courtyard of the apartment complex.  The officers observed a large amount of men's clothes lying in a pile on the ground in front of the open door to an apartment.  As they approached the door, they could hear a man, whom they later identified as father, yelling obscenities at a woman, identified as mother.  They noticed father cleaning the top of the kitchen table and mother sitting on one of the chairs.

The officers asked father to step outside to be interviewed.  As father approached them, he turned around and yelled at [mother] "because the police were at their apartment."  The officers saw a female baby—K.P.—in a "rocker" on the sofa and a four-year old female toddler—Z.P.—standing in front of the couch.  There were several holes in the hallway wall and additional clothing lying around the living room floor.  As one of

---

[2]     The jurisdiction/disposition report showed that father had an extensive criminal record dating back to 1994, including several drug-related offenses, and that approximately six months prior to the incident in question, father again had been convicted of possession of a controlled substance and placed on probation.

the officers interviewed father in the courtyard, he continued to yell obscenities at mother in front of the children.

Father told the officer that mother cut up his clothes with a pair of scissors and threw them in the courtyard. Father said mother did it because of an argument they had the night before. According to father, when he arrived home the night before, mother started yelling at him and accused him of being with another woman. He laid down on the couch and moments later, mother hit him several times in the head with her cell phone. Father stood up and told mother to stop hitting him. In response, mother began to push father. Father tried to hold mother's arms, but then pushed her away because she was becoming more violent. Father denied hitting mother and told the officer that she continued to approach him and yell at him. Father took a shower, went to bed, and fell asleep. When he woke up in the morning, mother continued to yell at him and argue with him about being with another woman. The police responded to that second argument, and, after speaking with officers, father left the apartment to allow mother to "cool down." When he returned home several hours later, mother had his clothes in the living room and they were "all cut up." Father became upset and started throwing his clothes out the front door because they were ruined.

The officer then interviewed mother who told him that when father came home the night before, he was not acting normally. She said father was under the influence of narcotics and she found a methamphetamine glass pipe in his pocket. According to mother, before she married father, he used methamphetamine, but he stopped when they were married and he had been sober for several years.[3] When mother questioned father about using methamphetamine, they began to argue. Mother stated that "they were physical with each other" and then father pushed her into the hallway causing injury to her forearm. The officer observed a bruise with swelling and several scratches on mother.

---

[3] As noted, father's criminal record included a conviction for drug possession approximately six months before the incidents in question.

Mother told the officer that before father arrived home that day, she took his clothes out of the closet and cut them with scissors. When father arrived home, he threw the clothes out the front door into the courtyard. Father and mother began to argue again, and later noticed that the police had arrived for the second time that day.

The police arrested father and, after he was advised of his *Miranda*[4] rights at jail, he confirmed that the night before, when he arrived home, mother began to hit him in the head with her cell phone while he was sleeping. He stood up, attempted to stop her, and was able to take the cell phone away from her and break it. Father did not have any bruises or scratches on the back of his head where he claimed mother had hit him. Father explained that he could have called the police on mother or inflicted serious injury on her, but he did not do so because they "always argued" and then "made up." Father did not consider the incident serious.

DCFS filed a petition under Welfare and Institutions Code section 300[5] alleging in counts a-1, b-1, and b-2 that: "a-1: On 06/02/2012, the children [Z.P and K.P's] mother, [S.G.], and father, [R.P.], engaged in a violent altercation in the children's presence. The father grabbed the mother's arms and pushed the mother into a wall, inflicting marks and bruises to the mother's arm. The mother pushed the father and struck the father's head with a phone. The mother destroyed the father's clothing. On 06/02/12, the father was arrested for Inflict Corporal Injury on Spouse/Cohabitant. Such violent conduct by the mother and the father endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger."

"b-1: On 06/02/2012, the children [Z.P and K.P's] mother, [S.G.], and father, [R.P.], engaged in a violent altercation in the children's presence. The father grabbed the mother's arms and pushed the mother into a wall, inflicting marks and bruises to the mother's arm. The mother pushed the father and struck the father's head with a phone. The mother destroyed the father's clothing. On 06/02/12, the father was arrested for

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

[5] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Inflict Corporal Injury on Spouse/Cohabitant. Such violent conduct by the mother and the father endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger."

"b-2: The children, [Z.P. and K.P.'s] father, [R.P.], has a history of substance abuse, and is a current abuser of methamphetamine, which renders the father unable to provide regular care and supervision of the children. On 06/02/12, the father was under the influence of illicit drugs while the children were in the father's care and supervision. On 06/02/12, the father possessed a drug pipe within access of the children. The father has a criminal history of a conviction of Possession of Controlled Substance and Possession of Controlled Substance Paraphernalia. Such substance abuse by the father endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger."

At the detention hearing, the juvenile court found that DCFS had made a prima facie case for detaining the children and showing that they were persons described in section 300, subdivisions (a) and (b). The juvenile court further found that a substantial danger existed to the physical or emotional health of the minors, that reasonable efforts had been made to prevent removal of the minors from the home, and that there were no reasonable means to protect the minors without removal. Temporary placement and custody of the minors was vested in DCFS. The juvenile court ordered the children detained in shelter care pending further court order, ordered family reunification services, and granted mother monitored visitation rights.

In a jurisdiction/disposition report, a CSW reported that during a subsequent interview, mother: denied that any physical altercation occurred between her and father; denied hitting father with her cell phone; denied destroying father's clothes; denied ever having a physical altercation with father; denied that father had drug arrests; and denied having any knowledge of father's drug use until she learned of his criminal record in connection with this case.

During a subsequent interview with a CSW, father: denied engaging in a physical confrontation with mother; denied injuring her; denied that his clothes were "scattered

8

around" on the day of his arrest; and denied being in possession of or using drugs. When asked about his criminal history, father stated, "[I]t doesn't matter" and indicated that his drug use took place prior to the birth of his children.[6]

In a last minute information for the juvenile court, a CSW reported that after three unsuccessful attempts to make an unannounced visit to mother's home, the CSW made an unannounced visit and found no problems. During that visit, mother told the CSW that she had not had any contact with father. The CSW also reported that father had not visited the children and, during an interview with father, he told her he did not want his visits with his children monitored. Father was not enrolled in any programs, but he told the CSW that he would consider enrolling in anger management classes. Father continued to refuse to drug test.

At the jurisdiction and disposition hearing, the juvenile court admitted into evidence without objection the detention report, the jurisdiction/disposition report, and the last minute information. Mother called her sister to testify. According to the sister, she witnessed the end of the incident leading to father's arrest and did not see mother or father become physical with one another or hear them "yelling." The sister also stated that mother and father were not in a relationship and that during the prior year, she had not seen them argue or become physical with one another.

During oral argument, mother's counsel contended that because the evidence showed only a one-time incident, it was insufficient to establish the allegations in paragraphs a-1 and b-1. Father's counsel joined in mother's arguments and also argued that the evidence was insufficient to support the drug abuse allegations in paragraph b-2. The children's counsel urged the juvenile court to sustain the petition in its entirety.

Following argument, the juvenile court sustained the petition as to paragraphs b-1 and b-2, finding that the children were dependents of the juvenile court under those paragraphs, but dismissed the allegations in paragraph a-1. The juvenile court then

---

[6]     See footnote 3, *ante.*

9

issued its disposition orders, including an order placing the children with mother, removing them from father, and granting father monitored visitation rights.

## DISCUSSION

### A. Standard of Review

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [60 Cal.Rptr.2d 315].) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."' [Citation.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321 [247 Cal.Rptr. 100].)' (See *In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].)" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 [82 Cal.Rptr.2d 426]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429]; *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 598 [207 Cal.Rptr. 728].)" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

### B. Jurisdiction

Father contends that there was insufficient evidence to support the juvenile court's jurisdictional findings as they related to him. According to father, the single incident between father and mother was insufficient to find jurisdiction under subdivision (b) of

10

section 300 because the children lived with mother who had no relationship with father at the time of the jurisdiction hearing. Father also contends that there was insufficient evidence to support the jurisdiction finding under the drug use allegations in paragraph b-2 of the petition because father was a noncustodial parent and his past drug usage was unrelated to the reason for the dependency proceeding.

DCFS argues that it is unnecessary for us to reach father's challenges to the jurisdictional findings as they relate to father. According to DCFS, because mother did not challenge on appeal the jurisdictional finding related to her, the juvenile court's jurisdiction will continue even if father's challenges are successful, citing *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.

We agree with DCFS that the juvenile court may retain jurisdiction based on the jurisdictional finding related to mother, regardless of the outcome on father's jurisdictional challenges. "'[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent.' (*In re Alysha S.*[, *supra,*] 51 Cal.App.4th [at p.] 397 [58 Cal.Rptr.2d 494]; accord, *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16 [33 Cal.Rptr.3d 242].) The child thus remains a dependent of the juvenile court." (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.)

In cases where the juvenile court retains jurisdiction regardless of the outcome of a parent's challenge to the jurisdictional findings as to him or her, we nevertheless have the discretion to hear the appeal if those jurisdictional findings may have an impact upon future proceedings. "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the

11

evidence.' (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [90 Cal.Rptr.3d 44].) However, we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal (see, e.g., *In re Alexis E., supra*, at p. 454; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1015 [124 Cal.Rptr.3d 795]; see *In re I.A.* (2011) 201 Cal.App.4th 1484, 1494 [134 Cal.Rptr.3d 441]); or (3) 'could have other consequences for [the appellant], beyond jurisdiction' (*In re I.A., supra*, at p. 1493 [not reaching the merits of an appeal where an alleged father 'has not suggested a single specific legal or practical consequence from this finding, either within or outside the dependency proceedings']).'' (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

But even assuming, without deciding, that the jurisdictional findings relating to father could have an impact upon some future proceeding in this action involving his rights, we nevertheless conclude that substantial evidence supported the juvenile court's jurisdictional findings under section 300, subdivision (b) relating to him. "[S]ection 300, subdivision (b), invokes the jurisdiction of the juvenile court and permits it to declare a child a dependent of the court when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . .' DCFS has the burden of showing specifically how the child has been harmed or will be harmed. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 [49 Cal.Rptr.2d 139]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 303 [19 Cal.Rptr.2d 544, 851 P.2d 826] [§ 300's purpose is 'to limit court intervention to situations in which children are threatened with serious physical or emotional harm'].) To declare a child a dependent of the court under section 300, the juvenile court must find by a preponderance of the evidence that the allegations are true. (*In re Matthew S., supra*, 41 Cal.App.4th at p. 1318; see § 355, subd. (a).)'' (*In re X.S., supra,* 190 Cal.App.4th at pp. 1159-1160.)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here [including subdivision (b)] require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' (*In re R.V.* (2012) 208 Cal.App.4th 837, 843 [145 Cal.Rptr.3d 772].)" (*In re I.J., supra*, 56 Cal.4th at p.773.)

Contrary to father's characterization of the evidence before the juvenile court, the jurisdictional findings as to him were not based on a single, isolated incident of domestic abuse unrelated to his substance abuse issues. When viewed in a light most favorable to the juvenile court's findings—as we are required to do—there was evidence supporting a reasonable inference that father had serious substance abuse issues that directly contributed to the multiple incidents in question. It was undisputed that father had a history of methamphetamine abuse and multiple criminal convictions for drug-related offenses, including a conviction for possession of a controlled substance for which he was placed on probation just six months prior to the incidents. It was also undisputed that father refused DCFS's request to drug test voluntarily and that he would not answer questions about his past drug usage. There was evidence that on the night before his arrest, he arrived home under the influence of methamphetamine with a glass pipe in his pocket. According to mother's statements to police, the couple began to argue about his drug use and that argument escalated into a physical confrontation in which both parties participated. The next morning the couple continued to argue, prompting a police response. Father left the home to allow mother to cool down, but when he returned, yet another argument erupted because mother had purposely ruined father's clothing and scattered it in the living room. This third argument in less than 24 hours prompted

13

another police response. The responding officers heard the couple arguing and heard father yell obscenities at mother in the presence of the children. Even after the police arrived and attempted to interview father, he continued to yell obscenities at mother in the children's presence. This third incident caused father's arrest and, at the jail, he told an interrogating officer that he and mother "always argue."

This evidence was sufficient to support a finding that the allegations in paragraphs b-1 and b-2 were true. As to paragraph b-1, the couple's verbal and physical confrontations in the home while the children were present, which according to father occurred frequently, supported a reasonable inference of a substantial risk of physical and emotional harm to the children. Mother not only hit father in the head with her cell phone, she cut up all of his clothes in an apparent act of retaliation. Father grabbed mother causing scratches to her arms and pushed her into a hallway causing bruising and swelling to her arm. Such evidence was sufficient to show physical acts of violence that not only created a risk of physical harm to the children, but also created a risk of emotional harm to them because they occurred in their presence.

Similarly, that same evidence supported an inference that the allegations in paragraph b-2 concerning father's drug use were true. The evidence established that father's drug abuse issues were not, as he and mother contended, a thing of the past. While on probation for a drug possession offense committed several months earlier, father came home the night before his arrest under the influence of methamphetamine with a glass pipe in his pocket. The couple argued over father's drug use and became physically violent toward one another as a result. Thereafter, father refused to drug test or discuss his past drug use, all of which supported a reasonable inference that father had current drug abuse issues that created a substantial risk of physical or emotional harm to the children.

## C. Disposition

Father contends that because he was aggrieved by the juvenile court's disposition order removing the children from his custody, he can appeal from that order. Therefore,

he contends on appeal that the removal order was not supported by sufficient evidence because mother had primary custody of the children and, at the time of the removal order, there had been no instances of domestic abuse for six months.

Even if father is correct and he is aggrieved by the removal order, it was supported by substantial evidence. "The juvenile court has wide latitude in making orders necessary for the well-being of a minor. By statute, the court may make 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . .' (§ 362, subd. (a).) However, the same statute limits such orders to those that are designed to eliminate the conditions that brought the minor to the attention of the court. (§ 362, subd. (c).)" (*In re Jasmine C.* (2003) 106 Cal.App.4th 177, 180.)

Father asserts that without the removal order, he would have been entitled to physical and legal custody of the children, with an interest in the companionship, care, custody, and management of their lives, including the right to make major life decisions for the children. Based on the evidence of father's drug abuse issues, including his history of methamphetamine abuse, drug-related criminal history, methamphetamine intoxication on the night before his arrest, and refusal to drug test, discuss his drug abuse issues, or enroll in drug treatment programs, the juvenile court could reasonably have concluded that the removal order was necessary to protect the children from father's drug abuse and related violent behavior. As the jurisdiction/disposition report made clear, father's family would visit with the children occasionally, and sometimes he would pick the children up for those visits. Moreover, when the children were with father's family, mother was unsure whether father also visited with them. Thus, but for the removal order, it was reasonable for the juvenile court to assume that the children would be at risk of harm from father's drug abuse issues and related behaviors during such visits with his family. Based on father's refusal to drug test and enroll in drug treatment programs, it was also reasonable for the juvenile court to conclude that the removal order was necessary to ensure that father adequately addressed and resolved his drug abuse issues prior to exercising his right to parental custody and control of them.

15

**D.     Cross-Appeal**

Based on our conclusion that the juvenile court's jurisdictional findings as to father were supported by substantial evidence, there is no need to reach DCFS's contention on cross-appeal that the jurisdictional allegations under dismissed paragraph a-1 were also supported by substantial evidence. "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' (*In re Alexis E.*[*, supra,*] 171 Cal.App.4th [at p.] 451 [90 Cal.Rptr.3d 44].)" (*In re I.J., supra*, 56 Cal.4th at p. 773.)

## DISPOSITION

The jurisdiction and disposition orders from which father appeals and DCFS cross-appeals are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.

16